IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TYLER B. KLINGENSMITH                                                          PLAINTIFF

v.                                    Civil No. 5:19-cv-5185
                                              5:20-cv-05015

DEPUTY ADRIAN CRUZ; LIEUTENANT
ROBIN HOLT; DEPUTY JOSEPH ALLEN;
DEPUTY MEGAN RUTLEDGE; DEPUTY
NICHOLAS GUERRERO;
LIEUTENANT RANDALL MCELROY;
SERGEANT JOE ADAMS; DEPUTY ANTHONY COBB;
SERGEANT BRADY; DETECTIVE MARK JORDAN;
JOHN DOE CAPTAIN; SERGEANT COGDILL;
BENTON COUNTY; JOHN DOE
SERGEANT WHO TOOK PICTURES; DEPUTY
ANTHONY COBB; and SERGEANT W. GUENTHER                    DEFENDANTS


## REPORT AND RECOMMENDATION

This is a civil rights action filed by Plaintiff Tyler Klingensmith pursuant to 42 U.S.C. §

1983.  Plaintiff proceeds in this matter *pro se* and *in forma pauperis*.  (ECF No. 1, 3).  Currently

before the Court is a Motion for Summary Judgment (ECF No. 199) which is filed on behalf of

Deputy Adrian Cruz, Robin Holt, Deputy Joseph Allen, Megan Rutledge, Nicholas Guerrero,

Lieutenant Randall McElroy, Sgt. Joe Adams, Deputy A. Cobb, Sgt. Trey Bandy, Sgt. Kenneth

Cogdill, and W. Guenther (the "Benton County Defendants").  Plaintiff has filed responses to the

Motion.  (ECF Nos. 227, 228).  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)

(2011), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the

undersigned for the purpose of making a Report and Recommendation on the pending Motion for

Summary Judgment.

## I.  BACKGROUND

As noted in the Court's contemporaneous Report and Recommendation related to Separate Defendant Mark Jordan's Motion for Summary Judgment, a short history is helpful. Plaintiff filed his original Complaint in this matter on September 27, 2019.  (ECF No. 1).  On January 14, 2020, Plaintiff filed a separate case, *Klingensmith v. Jordan, et al.*, 5:20-05015, involving largely the same Defendants and issues.  The two cases were consolidated on April 24, 2020.  (ECF No. 127).  At that time, the Court noted that Plaintiff's previous complaints were difficult to construe and contained "unnecessary verbiage."  (ECF No. 127 at 2).  The Court directed Plaintiff to file an amended complaint that clearly and concisely sets forth his claims against each named Defendant.  Plaintiff was limited to completing the form complaint and attaching up to six additional pages, and in addition, he was directed to provide the dates on which all events occurred and to assert a single cause of action for each claim or count.  (ECF No. 127).[1]

Plaintiff filed his Third Amended Complaint on May 14, 2020.  (ECF No. 135).  The Court found Plaintiff's Third Amended Complaint failed to comply with the Court's earlier Order entered on April 24, 2020, but despite Defendants' arguments in separate Motions to Strike (ECF No. 139, 142), the Court, seeking to "best serve the interests of justice and conserve judicial resources," declined to strike the Third Amended Complaint.  (ECF No. 144).  The Court performed the necessary preservice screening pursuant to the Prison Litigation Reform Act ("PLRA"), dismissing certain of Plaintiff's claims without prejudice.  *See* 28 U.S.C. § 1915A.

---

[1] In the Order consolidating the cases, and to streamline matters, the Court terminated as moot all motions pending as of April 24, 2020.  (ECF No. 127).

As set forth in the Court's Memorandum Opinion and Order, the following of Plaintiff's claims remained for "further litigation:"

- Fourth Amendment claims against Defendants Shrum, Jordan, and Holt with respect to Plaintiff's alleged false allegations in arrest warrants as set forth in Claims 2, 3, 13 and 16.

- Fifth Amendment claims against Defendants Shrum, Jordan and Holt with respect to the questioning of Plaintiff as described in Claim 4.

- Freedom of Information Act (FOIA) claims pursuant to Arkansas Code Annotated §§ 25-19-101, et seq., against Defendants Holt, Rutledge, McElroy, and Jordan with respect to Plaintiff's allegations that Defendants prevented his FOIA requests as set forth in Claim 5.

- Failure to Protect claims against Defendants Cruz and Guerrero with respect to Plaintiff's allegations that he was assaulted by inmate R.B. as set forth in Claims 6, 8 and 12.

- Failure to protect claims against Defendants Brady and Allen with respect to Plaintiff's allegations that he was assaulted by inmate R.B. as set forth in Claims 9 and 12.

- First Amendment retaliation claims against Cogdill, Jordan, Adams, Holt, Guenther, Rutledge, Brady, and Cobb with respect to Plaintiff's allegations that he was retaliated against for filing grievances as set forth in Claims 10 and 11.

- Fourth Amendment claim against Defendants Jordan and Shrum with respect to the alleged illegal search of Plaintiff's phone and alleged false statements in a search warrant related to Plaintiff's phone as set forth in Claim 14.

- Fourth Amendment claim against Defendant Jordan with respect to the alleged illegal search of Plaintiff's twitter account and alleged false statements in a search warrant related to Plaintiff's twitter account as set forth in Claim 15.

(ECF No. 144 at 10-11).

The Benton County Defendants filed their Motion for Summary Judgment seeking dismissal of Plaintiff's claims on May 28, 2021. (ECF No. 199). Plaintiff filed pleadings responsive to the Motion on September 23, 2021. (ECF Nos. 227, 228). The Motion is ripe for review.

## II. PLAINTIFF'S CLAIMS AGAINST BENTON COUNTY DEFENDANTS

The Court finds useful to include a recitation of Plaintiff's remaining allegations[2] against the Benton County Defendants using Plaintiff's contexts and descriptions. The Court has not attempted to correct the grammatical errors, recognizing the importance of substance over form.

In Claim 2 of the Third Amended Complaint, Plaintiff argues that County Defendant Holt and Separate Defendant Jordan "conspired to swear to, press against and force prosecution" for a "false sex-offense and others in order to obtain jurisdiction of my person in Indiana." (ECF No. 135 at 5). Plaintiff alleges Defendant Holt conspired with Jordan (a detective with the Bentonville Police Department) "to act as a bondsman so [Plaintiff] would answer his questions [but Plaintiff] refused." (ECF No. 135 at 5).

Plaintiff alleges in Claim 4 that Defendants Holt, Jordan, and others,

conspired to have Jordan act and impersonate a false representation of a bondsman on Feb. 1st, 2018, in a deceitful attempt to withdraw information from myself about the criminal investigation . . . at no point did Jordan notify me he was police officer or notified me of my rights . . . . Defendants conspired to question me under false pretenses after my arrest and I requested an attorney in an attempt to withdraw inculpatory evidence by personal statement but I refused to cooperate.

(ECF No. 135 at 9).

With respect to his FOIA claims, Plaintiff alleges in Claim 5 of the Third Amended Complaint that he

filed several FOIA requests after Jordan came to the jail and told R. Holt to 'make his life hell'; I notified R. Holt, Rutledge and McElroy that I was not a felon and provided the statute number of FOIA Requests; I mailed several requests to 1300 S.W. 14th St. 72712 through 4-2-18 until 8-20-18; I even had other people from

---

[2] In his Memorandum Opinion of August 20, 2020, Judge Brooks found that Plaintiff's Fourth and Fifth Amendment claims against Defendant Shrum survived dismissal but on December 7, 2020 – because an accurate service address was not provided by the Plaintiff and was otherwise unavailable to the Court – County Defendant Shrum was dismissed without prejudice. (ECF No. 167).

Indiana send requests; Rutledge stated R. Holt will not allow her to fulfill my requests, but if a person from the outside mails one or brings it to the jail she can do it without them finding out; but on 4-2-18 Rutledge returned my requests unfulfilled; I sent several requests to McElroy . . . said it had been confirmed 'you cannot file an FOIA'; On several requests it stated 'per Rainwater, Holt, and Sexton . . . you cannot file an FOIA', this is the same attorney Jordan emailed prior to my arrest conspiring to . . . me after my arrest and was sent to BCDC Administration as well; The defendants conspired to deny files, videos and other items that would have been useful and evidence in a civil case and others and attempted to hide behind their counsel and deny my FOIA requests because I refused to cooperate with their false sex offense investigation.

(ECF No. 135 at 9).

In Claim 6, Plaintiff alleges that Benton County Defendants Cruz and Guerrero violated his constitutional rights by failing to protect him from an alleged second sexual assault from another inmate Plaintiff identifies as Inmate "R.B." Plaintiff claims that Defendants Cruz and Guerrero placed him in a different pod other than his own and alleges that Cruz and Guerrero "released R.B. from his cell and R.B. was able to assault, batter, and sexually assault [Plaintiff] a second time." He alleges that he suffered "swelling, bruising, numbness, trouble getting erect, nerve damage, hemroids [sic], ulsers [sic] and emotional distress." (ECF No. 135 at 10).

Plaintiff alleges in Claim 8 that while detained in BCDC on April 15, 2018, he "was assaulted sexually and physically by R.B. when Cruz and Guerrero released him from his cell." Plaintiff alleges that Defendants Cruz and Guerrero thereafter made false statements in their incident reports that Plaintiff had received medical care. Plaintiff, however, denies he received medical care after the alleged attack by Inmate R.B. on April 15, 2018. (ECF No. 135 at 10).

In Claim 9, Plaintiff alleges he was sexually assaulted by R.B. on or about February 3, 2018. He alleges that, after the assault, he went to the shower to "wash feces from [his] legs; I went to the emergency button and placed several requests and grievances." Plaintiff alleges that Defendants Brady and Allen stated, over the emergency speaker, "Do you see what the button

says, then step back behind the red line." Plaintiff says "it was over 5 ½ hours before anyone

responded as I was going to yard and requested help again." Plaintiff contends that "Defendants

conspired to not protect and or respond to notifications of the assault." (ECF No. 135 at 11).

Plaintiff's Claim 10 alleges Defendants' failure to protect in that

[b]etween 2-12-18 and 3-24-18 I filed several grievances on Adams, Holt, Cogdill for keeping me on Ad. Seg. after Jordan made his threat towards me to Holt on 2-1-18, 'make his life hell'; On 3-24 Cogdill came to me and stated 'your not getting the picture, you need to do things our way or we'll make you'; Cogdill stated it was about my grievances; on 3-26 Jordan served a [null] warrant for a twitter acct; and stated 'you will be a sex offender for what you did', 'do you know what they do to sex offenders?'; I was then locked in Ad. Seg. on 3-26 and Chandler wrote a false discipline on 3-29 for showing naked in the shower, to justify the Ad. Seg. transfer; I was left in Ad. Seg. until 8-23 after my conviction; Adams made threat of intimidation and coercion to pursued me to cooperate; Defendants conspired to retaliate by locking me in Ad. Seg. without due process because I refused to cooperate in the investigation and filed grievances on this matter.

(ECF No. 135 at 11).

Claim 11 has been constructed by the Court as an allegation of a violation of Plaintiff's

First Amendment right against retaliation following grievances and processes in the Benton

County Detention Center:

On Feb. 1st Jordan told Holt to 'make his life hell'; Feb. 12th I went to civil court with no prior notice of the hearing; the judge ordered in favor of the petitioner; Jordan appeared and testified on behalf of petitioner; Adams, Cogdill kept me on ad. seg. After the investigation but released R.B. into population; Jordan spoke to Adams on . . . 5th & 6th about keeping me on Ad. Seg. and the assault; SRGT Brady told me to lock back down to my cell on several occasions during allotted rec time while doing law research; Cobb returned several letters I was sending to the courts and the newspaper; Adams told me to go through Cogdill with Ad. Seg. complaints; Cobb called me to . . . and stated 'we didn't thing you had it in you to fight back'; on several requests and grievances Holt told me I cannot have a notary or go to law library; on 4-12 Rutledge said R. Holt and others will not allow you to do a FOIA or go to law library; On 4-1 Guenther used 6 officers to invoke fear and intimidate me while she notarized my appeals and writs; Guenther would only notarize what she wanted to notarize and confiscated several witnesses forms/aff'd as well; I had to threaten Cruz on 3-30 (to sue him) so he would allow me to type the writs; Ross wrote me a disciplinary the same day for

6

'complaining' about not getting a notary, but I had already received the notary prior to the disciplinary; Defendants conspired to cause an untimely filing of motions in circuit court by frustrating and impeding my access to the court because I refused to cooperate in the investigation and . . . protested and appealed the civil court rulings.

(ECF No. 135 at 11, 12).

Claim 12 similarly alleges that on

2-1-18 Jordan told Holt to 'make his life hell'; I was locked in my cell for 2 days, released then attacked by R.B. sexually on 2-3; I hit the emergency button . . . times and sent requests and grievances; Brady and Allen failed to respond/protect to my attack for over 5 ½ hours; I was locked . . . for/until 3-24 Cogdill came and said 'your not getting the picture,' 'you need to do things our way or we'll make you,' in response to my grievances about coming off Ad. Seg.; 3/26 Jordan served a [null] search warrant and said 'you'll be a sex offender for what you did,' 'do you know what they do to sex offenders" as he nodded at deputy's; I was then placed in Ad. Seg. On 3-26 after Jordan's meeting until 8-23-18; 3-29 I filed a grievance on the reason to why I was in Ad. Seg. and 40 min later Ross wrote me a disciplinary for showering naked; On 4-1 Guenther notarized my appeals (only ones she wanted to notarize) and confiscated (3) aff'd of witnesses; 4-1 after the notary, about 4 hrs. later Ross wrote me a disciplinary for requesting and acting irate over a notary; these disciplinaries are to try to justify my holdings in Ad. Seg.; On 4-15 Cruz and Guerrero gave me a haircut, told me to shoer in 103 due to my single man custody status and people were in 102 (I never lived in 103); Cruz and Guerrero released R.B. from his cell and he sexually assaulted me a second time in the shower; R.B. received medical care, but I was placed in the chapel and then in my cell once Srgt. 'H' took pictures and stated Infante and Trimmer were on duty in medical; Defendants conspired to . . . lock me in a cell, failed to protect/respond on 2-3 to an assault; locked me in Ad. Seg. without due process, wrote false disciplinaries, confiscate and not provide legal necessities, orchestrate an attack and assault on 4-15, failed to provide medical asst. on 4-15 after 2nd sexual assault and kept me locked in Ad. Seg. until after conviction because I refused to cooperate within their investigation . . . and incriminate myself and plea to a known false sex offense allegation . . . .

(ECF No. 135 at 12, 13).

## III.  UNDISPUTED FACTS

After reviewing the summary judgment pleadings submitted, the following material facts appear undisputed:

- Plaintiff was arrested in Indiana on January 18, 2018, and

was held at the Marion County Jail in Indianapolis, Indiana following his arrest. (ECF No. 197-2).

- Officer Colin Shrum served Plaintiff with probable cause warrant BVP2018-18 on the following charges: Sexual Extortion, Financial Identity Fraud, Non-Financial Identity Fraud, Terroristic Threats First Degree (two counts), and Unlawful Distribution of Sexual Images. (ECF No. 197-3).

- Officer Shrum transported Plaintiff to the Bentonville Police Department and conducted an interview. (ECF No. 197-3).

- Plaintiff signed a waiver that he understood his Miranda rights and agreed to speak to Officer Shrum without an attorney. (ECF No. 197-3).

- Plaintiff was digitally photographed, fingerprinted, and booked into the Bentonville Police Department. Upon completion of Plaintiff's booking, Officer Shrum transported Plaintiff to the BCDC. (ECF No. 197-1 at 1-2; 197-3).

- Upon booking at the BCDC in January 2018, Plaintiff was first assigned to general population in one of two pods designated for sex offenders, E107. (ECF No. 205-1 at 1). According to the undisputed affidavit of Defendant Adams, Plaintiff was originally assigned to a sex offender housing unit because he was accused of a sex offense. At that time of Plaintiff's initial assignment, he had no history of problems with other inmates or officers. (ECF No. 205-1).

- On February 3, 2018, Plaintiff was involved in an altercation with another inmate, Robert Brinegar, in the BCDC. (ECF No. 205-1; 201-5).

- Deputy McConnell filed an incident report concerning the February 3 altercation:

  On 2/3/2018 I, Deputy McConnell was assigned to E-Pod. At approximately 1240 hours, I was sitting in Pod Control as the Pod Control Deputy and

Deputy Kelley went and opened E-107 for outside recreation. Once all of the inmates that wanted to go outside went to the rec yard, an Inmate who was identified as Inmate Klingensmith, Tyler (OCA# 0125923) stopped just outside of the Pod door and asked Deputy Kelley if he could speak to him. The Pod Control area was secured, and Inmate Klingensmith started talking to Deputy Kelley. I had overheard something along the lines of assault, at which time I stood up and walked over to where Inmate Klingensmith was standing talking to Deputy Kelley. I had asked Inmate Klingensmith if he was assaulted and he said "no, but I am afraid I'm going to be!" Deputy Kelley then told Inmate Klingensmith to have a seat at which time I asked Inmate Klingensmith what had happened. Inmate Klingensmith said he was in the Public Restroom (PR) using the bathroom when Inmate Brinegar, Robert (OCA# 65497) came in and touched his shoulder. Inmate Klingensmith said he told him to get out and that Inmate Brinegar said he was the official PR flusher and walked out. Inmate Klingensmith said that Inmate Brinegar again came back into the PR, Inmate Klingensmith said that he jumped up standing naked ready to defend himself. Inmate Klingensmith said he told Inmate Brinegar to "get the fuck out!" and Inmate Brinegar wouldn't.  Inmate Klingensmith said that both Inmate Brinegar and himself put their fists up to fight and then Inmate Brinegar bucked at him and then walked back out of the PR. Inmate Klingensmith then said as he exited the PR that Inmate Brinegar was making rude comments to him and that he feared for his life. The Shift Sergeant, Sergeant Brady and Corporal Ross were both called and instructed myself that Inmate Klingensmith needed to be segregated until an investigation was completed. There was an open cell in E-104 (cell 148) and I escorted Inmate Klingensmith into that cell and informed him he was going to be placed on Administrative Segregation (ADSEG) until further notice. Corporal Ross then came to E-Pod to look at camera. Corporal Ross had video pulled up but was not able to visually see the top tier of E-107 to verify Inmate Klingensmith's accusations. Corporal Ross then said the Inmate Brinegar needed to be placed on ADSEG as well, pending an investigation. Corporal Ross and Deputy Kelley called for Inmate Brinegar to come to Pod Control, once outside of E-107, Corporal Ross then explained to Inmate Brinegar that there were accusations placed against him and that he was going to be put in E-103 (cell 131) until further notice. Corporal Ross and Deputy Kelley escorted Inmate Brinegar into E-103 (cell 131). Sergeant Brady and Corporal Ross called for Inmate Klingensmith to be escorted in the ministry room in E-Pod for further questioning and Inmate Klingensmith was then escorted back into E-104 (cell 148). Deputy Kelley collected both Inmates personal belongings and returned it to each Inmate. I continued my duties as E-Pod Control.

(ECF No. 201-1; 201-5 at 2).

- Plaintiff was "segregated until an investigation was complete."  (ECF No. 201-5 at 2).

- According to BCDC personnel records, Defendant Allen did not work at BCDC on February 3, 2018. (ECF No. 201-1 at 2; 201-8).

- According to Defendant Adams' undisputed affidavit, the February 2018 incident was reported as a possible claim under the Prison Rape Elimination Act ("PREA") because Plaintiff reportedly was nude at the time of the incident and made an initial allegation of sexual assault. (ECF No. 205-1 at 2).

- Defendant Adams was a Sergeant in the BCDC and was assigned as the PREA investigator and as a housing or classification officer. Defendant Adams was assigned to investigate the matter. (ECF No. 205-1 at 1, 2).

- During the investigation, Defendant Adams spoke to another inmate who accused Plaintiff of threatening him and taking food from him. This inmate reported Plaintiff told him that he knew where the inmate's family lived and knew people outside the jail who could kill the inmate's family. (ECF No. 205-1 at 2). The inmate reported Plaintiff walked around in front of other inmates in the nude and masturbated in front of other inmates. (ECF No. 205-1 at 2).

- While Plaintiff denied threatening the other inmate or masturbating in front of others, Plaintiff admitted he was frequently naked in front of other inmates and slept in the nude even when he had a cell mate. (ECF No. 205-1 at 2).

- During the investigation, it was reported to Defendant Adams that Plaintiff "camped out" in "the nude" in the public restroom, forcing all the other inmates to use the only other public restroom. (ECF No. 205-1 at 2).

- Inmate Robert Brinegar reportedly approached Plaintiff in the restroom and put his hand on Plaintiff's shoulder, but Brinegar denied pushing Plaintiff and stated that the

incident involved verbal issues only.  Plaintiff reported that Brinegar approached Plaintiff (who was admittedly nude) in the public restroom; pushed him and left the restroom.  Plaintiff alleged that Brinegar's pants were up and that "he did touch him with his genitals."  (ECF No. 205-1 at 3; 205-2 at 1).

- According to Defendant Adams' undisputed affidavit, during investigation of the February 3rd incident, Adams did not find evidence of a sexual assault.  (ECF No. 205-1 at 3).

- In an email dated February 4, 2018, a BCDC pod deputy reported to Defendant Adams that other inmates in E104 advised Plaintiff was masturbating in his cell while looking out the window at them.  They complained they had to walk up the stairs on the other side of the pod (due to Plaintiff's cell being below the stairs) to avoid seeing him masturbating.  (ECF No. 205-3).  Based on the February 4th email report, Defendant Adams decided that it was necessary to keep Plaintiff separate from other inmates for the time being.  (ECF No. 205-1 at 3).

- As a result of the investigation, on February 9, 2018, Defendant Adams placed a "keep separate" between Plaintiff and Brinegar, which was instituted to keep them from being housed in the same pod.  (ECF No. 205-1 at 3; 205-2 at 2).

- On March 12, 2018, as a result of probable cause warrant BVP2018-18, Plaintiff was charged in the Benton County Circuit Court with Sexual Extortion, Fraudulent Use of a Credit or Debit Card, Computer Fraud, Terroristic Threatening in the First Degree, Unlawful Distribution of Sexual Images or Recordings, Harassing Communications, Stalking in the Third Degree, and Violation of a Protective Order.  (ECF No. 197-4).

- On March 21, 2018, a BCDC lieutenant forwarded Defendant Adams a grievance that

another inmate filed about Plaintiff.  The inmate reported that Plaintiff (while in E104) was always starting problems with the Latino inmates by saying that he was going to extort their Mexican families and by making threats against them.  The inmate undisputedly grieved that "we should not have to deal with this guy.  We are punished for even talking to him but yet he can make threats against us and our families!  He also calls us chomo's!  If this guy isn't removed from this pod I will be forced to file a lawsuit."  (ECF No. 205-1 at 3-4; 205-4).

- On March 26, 2018, Plaintiff was moved to Administrative Segregation (hereinafter "lockdown") in E102.  (ECF No. 205-1 at 4).

- Deputy Adam Chandler filed an incident report on March 29, 2018, stating:

  On 3/29/2018 I Deputy Chandler was stationed in E-Pod.  At approximately 0722 Inmate Klingensmith . . . went out on recreation (Rec), for one hour.  At approximately 0820 Inmate Klingensmith went into the shower instead of heading back towards his cell.  I told Inmate Klingensmith that he needs to finish his shower and head back to his cell.  Inmate Klingensmith told me that he just got in the shower and was going to wash up.  At approximately 0830 Inmate Klingensmith was still in the shower.  I told Inmate Klingensmith that he is only allowed a one hour rec and his one hour ended about ten minutes ago.  Over the intercom I told Inmate Klingensmith one last time to go into his cell.  Inmate Klingensmith stepped out of the shower naked to grab his clothes that were on the railing.  I left pod control and walked over to the E102 pod door.  Inmate Klingensmith proceeded to get changed in the shower but with the shower door wide open.  I told Inmate Klingensmith that I would be locking him down due to not being fully clothed.  I am locking down Inmate Klingensmith for A15 and C7 infractions.

  (ECF No. 201-5 at 3; 205-1 at 4).

- As a result, on March 29, 2018, Plaintiff began his first thirty-day lockdown as discipline for Plaintiff's indecent exposure based upon Deputy Chandler's conclusion that Plaintiff intentionally exposed himself to other inmates by leaving the door open

to the shower after he showered and while dressing himself.  (ECF No. 201-5 at 3; 205-1 at 4).

- BCDC Deputy Tyler Ross filed an incident report regarding an early morning incident on April 1 involving Plaintiff, stating:

On 04-01-2018, I was called to E-Pod.  When I arrived in E-Pod I was informed that Inmate Klingensmith . . . had cussed at the deputies and was flipping them off while he was out on his rec.  I asked them what his issue was and Deputies Kemp and Vinson told me that he wanted a notary to sign his paperwork.  I pulled Inmate Klingensmith out to pod control and asked why he was being disrespectful to deputies.  He told me he was mad because it is our legal obligation to sign his paperwork if we have a notary here.  I told him that if a notary was here it would be their choice on if the wanted to put their name on his paperwork.  He told me that it needs to be done right this minute or I'm breaking the law.  I asked him to go put in a request to an LT and see if they can get a notary during the week to sign his paperwork.  He told me yet again that it needed to be done now because he is representing himself in his case and I needed to call a notary by law and have them come and sign his documents. I told him again to put it in on the kiosk. He told me that it was already put in when he first came out on rec. I informed him that they should get back to him in the morning. I then told him to go ahead and go back into the pod. As he walked back into the pod he began cursing at us. I told him that if he wanted to continue to be disrespectful that I would end his rec. He continued mouthing and cursing even after I told him to stop. I walked into the pod with Deputy Vinson and ended his rec. As we started escorting him to his cell he continued cursing at us and told us that we were breaking the law. Once he was in his cell, I shut the door. After the door shut he said "you guys are nothing but punk bitches" I told him that I would be locking him down for interference with facility operations and disruptive conduct. Once back out at pod control he pressed the intercom button and requested to speak with a sergeant. Sergeant Johnson entered the pod and told Inmate Klingensmith that if he needed a notary to put in a request and he should hear back from an LT in the morning. While Sergeant Johnson was talking to him Deputy Kemp and I gathered all of his commissary items, due to me locking him down. We then exited the cell and retuned to our normal duties.

(ECF No. 201-5 at 4).

- As a result of this incident on the morning of April 1, Plaintiff received another disciplinary lockdown for a period of twenty-five days.  This was Plaintiff's 2nd lockdown.  (ECF No. 201-5 at 4; 205-1 at 4).

- On the afternoon of April 1, 2018, Plaintiff received another lockdown (for a thirty-day period) for giving the deputy a false name in order to receive indigent supplies. (ECF No. 205-1 at 4).   This was Plaintiff's 3rd lockdown.

- On April 15, 2018, (while still in lockdown), Plaintiff had another altercation with inmate Brinegar while Plaintiff was in the shower.  (ECF No. 205-1 at 4).  According to Defendant Adams' undisputed Affidavit, Plaintiff received no punishment for the altercation because he was not the aggressor but, because the second altercation was between two offenders and because Plaintiff was nude at the time of the incident, Defendant Adams investigated the matter.  (ECF No. 205-1 at 4).

- BCDC Deputy Kyle Hubbard filed the following incident report concerning the April 15, 2018, incident:

On 04-15-2018 at approximately 2053 hours I was in Booking when assistance was called to E-103. I responded and entered E-103 housing block. The incident was upstairs next to the shower. I came upon the incident with deputies assisting Inmate Brinegar, Robert (OCA#65497) being assisted to his feet with handcuffs on. I observed deputies escorting Inmate Brinegar to E-Pod Control, and I asked about the inmate in the shower facing the wall. Inmate Klingensmith, (OCA#125923) informed me he was assaulted first and defended himself. I exited E-103 and assisted Deputy Young in escorting Inmate Brinegar to the Nurses Station to be examined because he had sustained some injuries. Inmate Brinegar had a cut on his face. Nurse Nicole cleaned his would and put butterfly stitches on the wound and covered it with gauze. Deputy Young and I escorted Inmate Brinegar back to E-103 cell 218. I asked Inmate Brinegar what happened. Inmate Brinegar informed me he was out of his cell getting medication from the pod deputy and was going back to his cell when he seen Inmate Klingensmith in the shower. Inmate Brinegar has had previous issues with Inmate Klingensmith, stating to me "I was taking my opportunity to do something about it." I informed Inmate Brinegar that was all I need to know. I walked out of the cell and closed the door. I entered E-pod minister room and questioned Inmate Klingensmith about the incident. Inmate Klingensmith informed me he was assaulted and was only defending himself. Inmate Klingensmith was informing me of the previous issues he has had with Inmate Brinegar. I interrupted Inmate Klingensmith saying I don't care about past situations and that I was only inquiring about the situation that had just taken place. Inmate Klingensmith informed me he had just gotten a haircut

and the deputies in E-pod were letting him use the shower in E-103, because there were cleaners in E-102 still cleaning. Inmate Klingensmith current housing unit was E-102 during the time of the incident. Inmate Klingensmith was allowed to use the E-103 shower because he is a house and recreation alone inmate, and there were inmates in the dayroom in E- 102. I asked Inmate Klingensmith if he needed medical attention or if he had any injuries. Inmate Klingensmith had two scratches first injury is located on his chest and the second on his left upper shoulder. I took pictures of Inmate Klingensmith's injuries and escorted Inmate Klingensmith to E-102 door. I continued with my duties with no further incidents.

(ECF No. 201-5 at 5).

- Defendant Adrian Cruz filed an incident report concerning the April 15, 2018, matter:

On April 15, 2018, I, Deputy Cruz was assigned to E-pod. At approximately 2040 hours Inmate Klingensmith, Tyler (OCA#0125923) was out in E-pod hallway getting his haircut. Inmate Klingensmith asked me if he could take a quick shower after he was done with his hair cut. I had Inmate Klingensmith take a shower in E-103 due to him being house and rec alone with the inmates that were out cleaning E-102. At this time E-103 was locked down. At approximately 2052 hours I had Inmate Brinegar, Robert (OCA#65497) come out of his cell to grab his medical cream that the nurse left for him. I gave Inmate Brinegar his medical cream. As Inmate Brinegar was walking up the stairs to go back to his cell he stopped at the shower and said to Inmate Klingensmith "this dick". Unbeknownst to me both inmates had a keep separate. I told Inmate Brinegar to go back to his cell. Inmate Brinegar did not comply with my order and charged aggressively toward Inmate Klingensmith in the shower. At this time, I called for assistance. I ran up the stairs and took control of Inmate Brinegar and put him on the ground. I placed Inmate Brinegar in hand cuffs and escorted him out to E-Pod Control. Both inmates were checked out by the nurse. Inmate Brinegar will be locked down for an A-4 offense (Assault and Battery) pending a disciplinary hearing. I then returned to my duties with no further incident.

(ECF No. 201-5 at 6).

- On April 16, 2018, four additional BCDC deputies filed supplemental incident

Reports with respect to the April 15th incident:

a. Nicholas Guerrero stated:

On Sunday April 15, 2018, I, Deputy Guerrero was assigned to E-Pod. At approximately 2052 Inmate Klingensmith, Tyler (OCA#0125923) was taking a shower in E-103. Deputy Cruz pulled Inmate Brinegar, Robert

(OCA#65497) out so that he could give him his medical cream that the nurse left for him. Upon getting his cream from Deputy Cruz, Inmate Brinegar started to go up the stairs. He charged aggressively into the shower that Inmate Klingensmith was in. Upon seeing this Deputy Cruz called assistance I then repeated assistance in E-103. Deputy Cruz then gained control of Inmate Brinegar and put him on the ground. Both inmates were checked out by nursing staff. I then returned to my duties with no further incident.

b.  Matthew Young stated:

At approximately 2052 April 15, 2018 I Deputy Young responded to an assistance call in E-103. As I get their deputy Cruz had Inmate Brinegar, Robert (OCA#65497) on the ground and handcuffed. I picked Inmate Brinegar up and escorted him out of the pod into the nurse station, where the nurse cleared Brinegar. After he was cleared by the nurse I escorted him back to his cell and returned to may daily duties with no other incidents.

c.  Marshall Hill stated:

On April 15, 2018 I, Deputy Hill, was assigned to D-pod. At approximately 2052 hours assistance was called to E-pod via radio. Once I arrived at the incident in E-103, there was an inmate in the shower on the top tier. The inmate was identified as Inmate Klingensmith, Tyler (OCA#125923). I told Inmate Klingensmith to face the back wall of the shower. I then told him to get dressed. Once he was dressed I escorted him out to pod control where I placed him in the E-pod ministry room. I returned to my duties with no further incident.

d.  Andrew Carter stated:

On April 15, 2018, I, Deputy Carter, was assigned to D-Pod. At approximately 2052 hours, assistance was called to E-103. When I arrived to E-103, Deputy Cruz had Inmate Brinegar, Robert (OCA#65497) on the floor and in handcuffs. While being escorted out of the pod, Inmate Brinegar began yelling and cursing at deputies. Inmate Brinegar was then placed on the wall. After Inmate Brinegar had calmed down, he was escorted to the nurse station to have a laceration on his left cheek bandaged. I returned to my duties with no further incident.

(ECF No. 201-5 at 7).

- Defendant Adams spoke with Plaintiff about the incident and Plaintiff advised that

  Brinegar came into the shower while Plaintiff was showering; that Brinegar pushed

  Plaintiff against the back wall and grabbed Plaintiff's genitals; and Plaintiff struck

Brinegar to defend himself.  (ECF No. 205-1 at 5).

- Defendant Adams spoke with Brinegar, and he said he was angry at Plaintiff for making a PREA allegation against him months prior.  Brinegar admitted he came downstairs to get medication from Defendant Deputy Cruz; Brinegar saw Plaintiff while on the way back to his cell; attempted to punch Plaintiff but missed; and was struck by Plaintiff who did not miss.   Brinegar said Deputy Cruz broke up the fight within moments.  Brinegar complained that he did not injure Plaintiff but would be scarred from Plaintiff hitting him. Brinegar denied sexual contact, denying that he touched Klingensmith's genitals and describing it simply as a fight.  (ECF No. 205-1 at 5).

- Defendant Adams reviewed the video of the April 15th incident.   (ECF No. 205-1 at 5).  As the video begins, Defendant Deputy Cruz is seen coming in the door of the pod and Inmate Brinegar is seen coming out of a cell on the upper tier. Brinegar walks part of the way down the stairs and retrieves something from Deputy Cruz. Brinegar goes back up the stairs and stops at the shower (located at the top corner of the stairs) (8:53:28). Deputy Cruz can be seen at the bottom of the stairs saying something. Within seconds, Brinegar throws the door of the shower open and rushes into the shower. (8:53:38). Cruz runs up the stairs and pulls Brinegar out of the shower and to the floor. (8:53:44).   Other officers arrive and assist in removing Brinegar and later – after he has dressed in the shower – removing Plaintiff who exited the shower area at 8:58:08, less than five (5) minutes after the altercation commenced.  Plaintiff does not appear injured in the video.  (ECF No. 201-7).

17

- Defendant Adams discussed the incident with Defendant Deputy Cruz. (ECF No. 205-1 at 5).

- At the time of the incident, inmates in Plaintiff's pod (E-102) were out cleaning and the inmates in E-103 were locked down.   (ECF No. 201-5 at 6).

- Defendant Adams concluded that Brinegar had been allowed out of his cell to retrieve medication from Deputy Cruz and Brinegar used that opportunity to attack Plaintiff; however, Deputy Adams concluded there was no evidence of a sexual assault during the April 15th altercation.  (ECF No. 205-1 at 4, 6).

- On May 7, 2018, Plaintiff received another disciplinary lockdown for disrupting meal delivery by cursing and profanity directed at deputies and then challenging a deputy to fight with him.  (ECF No. 205-1 at 6).  This was Plaintiff's 4th lockdown at BCDC.

- According to Defendant Adams' calculations, Plaintiff was on disciplinary lockdown from March 29, 2018, until June 1, 2018, with some of his lockdown periods running concurrently.  (ECF No. 205-1 at 6).  On June 1, Plaintiff was placed back in to E107 General Population (the least restrictive housing) by Defendant Sgt. Cogdill.  (ECF No. 205-1 at 6).

- According to Jail Incident Report 2018-J01116, on July 27, 2018,

   several inmates in E107 approached Deputy Allen throughout the day and requested that Inmate Klingensmith . . . be removed from the pod.  When asked why they wanted Inmate Klingensmith removed from the pod, multiple inmates stated that Inmate Klingensmith keeps making deals with other inmates that he cannot repay.  One of the inmates stated that Inmate Klingensmith has asked other inmates to write his mother a message for him and he would repay them by buying them soups off of commissary. The inmate went on to say that he has not repaid his debts.  Other inmates stated that Inmate Klingensmith will use the sink in the public restroom and not cleanup his mess.  Inmate Klingensmith was placed on Protective Custody for his safety.

(ECF No. 201-5 at 8).

- Plaintiff was returned to lockdown from August 11, 2018, until August 23, 2018, due to on-going issues with other inmates. (ECF No. 205-1 at 6).    This was Plaintiff's 5th lockdown at BCDC.

- On August 10, 2018, Plaintiff's charges were amended to include Stalking in the Second Degree, Terroristic Threatening in the First Degree, Financial Identity Fraud, Unlawful Distribution of Sexual Images or Recordings, and Violation of a Protective Order. (ECF No. 197-4; 197-5).

- On August 13, 2018, Plaintiff pled guilty to Stalking in the Second Degree, Terroristic Threatening in the First Degree, Financial Identity Fraud, Unlawful Distribution of Sexual Images and Recordings, and Violation of a Protective Order. (ECF No. 177-3; 197-7).

- Plaintiff was sentenced to ten years in the Arkansas Department of Correction. (ECF No. 197-7).

- On August 23, 2018, Plaintiff was returned to general population at BCDC and stayed there until he was released from BCDC custody on September 10, 2018. (ECF No. 205-1 at 6).

- Plaintiff submitted multiple requests and/or grievances throughout his incarceration at the BCDC. (ECF No. 201-3).    For example, Plaintiff made requests and/or grievances about commissary (ECF No. 201-3 at 1, 7, 17, 18, 19, 23, 25, 26); legal supplies (ECF No. 201-3 at 5); FOIA requests (ECF No. 201-3 at 6, 21, 24); notary requests (ECF No. 2, 3, 18, 19); the incidents with inmate Brinegar (ECF No. 201-3 at 8, 20, 21, 24); requests to be taken off of "protective custody" (ECF No. 201-3 at 8,

9, 10, 13, 14, 16, 25, 26, 29, 30, 31, 32); meals (ECF No. 201-3 at 9, 10, 11, 28); medical care (ECF No. 201-3 at 9, 22, 28); his intake property inventory (ECF No. 201-3 at 11, 12, 13, 14, 15); medical billing (ECF No. 201-3 at 12, 16); mail (ECF No. 201-3 at 14, 17, 28, 29); law library access (ECF No. 201-3 at 14, 15); and requests for copies (ECF No. 201-3 at 15).

- Defendant Robin Holt was not present when Plaintiff met with Separate Defendant Detective Mark Jordan. (ECF No. 201-9 at 2). Defendant Holt denies that she "set up" a meeting between Plaintiff and Defendant Jordan with any understanding or belief that Defendant Jordan would attempt to or impersonate a bondsman to get any information from Plaintiff. Defendant Holt avers that she was not involved in, or aware of, any affidavits presented in support of warrants for Plaintiff's arrest, or any search and seizure warrants related to his criminal charges. *Id.*

- At the Benton County Sheriff's Department, FOIA requests are handled through the public information officer who is stationed in the Administration offices of the Sheriff's Department. (ECF No. 201-9 at 2). According to the undisputed Affidavit of Robin Holt, neither Defendant Holt nor any other Detention Center staff were authorized to respond to FOIA requests.

- According to the undisputed Affidavit of Defendant Holt, it is the policy of the Benton County Detention Center to provide notary services on formalized legal documents which required a notary as a witness. (ECF No. 201-9 at 2-3). Handwritten papers were not notarized because of the sheer volume of the requests for notaries.

- At the time of the events alleged in this lawsuit, BCDC provided access to electronic legal materials to inmates who were representing themselves in legal matters. (ECF No. 201-9 at 3). The electronic law library was provided by computer access in the ministry room and was sometimes limited by time or capacity. Inmates who were represented by legal counsel were directed to speak to their attorney.

- During Plaintiff's incarceration at BCDC only Defendant Adams and Defendant Cogdill possessed authority to make housing or classification decisions. (ECF No. 205-1 at 1).

- It is the policy of the BCDC to classify its inmates in a way that furthers public safety while providing reasonably safe and humane housing for inmates, considering the physical constraints of the existing facility structure, scarce resources, staffing, and inmate population. (ECF No. 201-6 at 1).

- It is the policy of BCDC to provide facilities and programming which enable inmates to be confined in a variety of detention settings based on risk, status, and need for separation from other classes of inmates. (ECF No. 201-6 at 6). Inmates may be placed in administrative segregation for medical, mental, safety, security, or disciplinary reasons. Inmates may be placed in protective custody segregation, which includes separation for threats made against the inmate, the inmate's legitimate fear for their safety, and/or determination by a member of staff based on the belief the inmate's safety is jeopardized in general population. Inmates may also be segregated for disciplinary reasons. (ECF No. 201-6 at 6).

- It is the policy of BCDC to maintain a system of strict inmate discipline while incorporating due process and maintaining order within the facility. (ECF No. 201-6

at 12). Inmates are required to conform to the standards of conduct reflected in posted rules and regulations. Any inmate who violates a facility rule or regulation is subject to disciplinary action under the provisions of this policy. (ECF No. 201-6 at 12).

- It is the policy of the BCDC to provide a safe, humane, and secure environment for inmates and staff. (ECF No. 201-6 at 19). As part of this effort, BCDC administers a program of prevention, detection, response, investigation and tracking of reported and/or suspected sexual predators and targeted individuals. Sexual assault is not tolerated, regardless of employee or inmate status. (ECF No. 201-6 at 19).

- It is the policy of the BCDC that employees, contractors, and volunteers have the responsibility to immediately report any known or suspected sexual misconduct. (ECF No. 201-6 at 20).

- It is the policy of BCDC that management, supervisors, and investigators develop and carry out programs that: (1) treat reported credible incidents of prohibited conduct seriously and ensure that suspected acts or allegations are reported through the chain-of-command; (2) refer substantiated allegations of prohibited conduct and any false reporting for disciplinary action and/or criminal prosecution; (3) ensure that victims who report sexual assaults are referred to medical staff for possible treatment; (4) provide information to inmates during intake on sexual assault prevention, reporting of incidents and potential disciplinary and criminal sanctions that may apply - this information may include data on self-protection and counseling; (5) adequate separation between alleged victims and suspects during investigations and thereafter;

(6) discipline and/or criminally prosecute inmates, staff or others that commit violations of facility rules or the law. (ECF No. 201-6 at 27-28).

- It is the policy of the BCDC to maintain an inmate grievance system consistent with due process.  (ECF No. 201-6 at 24).

- To prevent reprisals against an inmate, disciplinary action may be taken against a staff member who retaliates or attempts to retaliate against an inmate filing a grievance.  (ECF No. 201-6 at 24).

## IV.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## V.  DISCUSSION

### A.  Fourth Amendment Claims

The County Defendants argue they are entitled to summary judgment with respect to all of Plaintiff's Fourth Amendment claims.

As noted above, this Court – applying the required deference and liberal construction – previously determined that Plaintiff's Third Amended Complaint states plausible Fourth Amendment claims in Claims 2, 3, 13 and 16. (ECF No. 144 at 10-11).  With respect to these particular claims, however, the only remaining County Defendant implicated is Defendant Holt and he is named only in Claim 2.  Thus, the only Fourth Amendment claims remaining for analysis are Plaintiff's allegations that Defendant Holt and others conspired to make false probable cause statements in the affidavits for Plaintiff's arrest and allegations that Defendant Holt conspired with Separate Defendant Jordan to act as a "bondsman so I would answer his questions." (ECF No. 135 at 5).

Generally, to prove a § 1983 conspiracy claim, a plaintiff must show that defendant (1) conspired with others to deprive him or her of a constitutional right; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). While "the plaintiff need not show that each participant knew the exact limits of the illegal plan . . . [he] must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights." *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) (cleaned up). Plaintiff is additionally required to prove a deprivation of a

constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999) ("it remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient ... [w]ithout a deprivation of a constitutional right or privilege, [the defendant] has no liability under § 1983"). "Liability under Section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990) (citing *Rizzo v. Goode*, 423 U.S. 362, 370 (1976)). To state a cognizable § 1983 claim, a complaint must set forth specific factual allegations showing what each named defendant allegedly did, or failed to do, that violated the plaintiff's constitutionally protected rights.

The Fourth Amendment to the United States Constitution protects Plaintiff only from unreasonable searches and seizures. U.S. Const. Amend. 4; *Mountain Pure, LLC v. Roberts,* 27 F.Supp.3d 962, 968 (E.D. Ark. 2014) (citations omitted). Plaintiff's factual allegations are subject to dismissal because they do not constitute a plausible Fourth Amendment constitutional violation against Defendant Holt. Unlike Separate Defendant Jordan[3], the record is devoid of any evidence that Defendant Holt prepared, signed, or produced any affidavit in support of Plaintiff's arrest or search of his property or that Defendant Holt participated in any seizure of Plaintiff's person or search of his property. Plaintiff similarly offers no evidence of what Defendant Holt said or did that was constitutionally defective, presenting no evidence of any agreement or "meeting of the minds" between Defendant Holt and others to deprive Plaintiff of his Fourth Amendment (or other constitutionally protected) rights. *See Burton v. St. Louis Bd. Of Police Com'rs,* 731 F.3d 784, 798 (8th Cir. 2013), citing *White, supra.*

---

[3] Defendant Jordan's Affidavit of Probable Cause to Obtain an Arrest Warrant is located at ECF No. 211-4 at 67 - 79.

Considerable time is spent in Plaintiff's pleadings groundlessly concluding but not establishing that Defendant Holt "conspired" with Separate Defendant Jordan for Jordan "to act as a bondsman so I would answer his questions and I refused." (ECF No. 135 at 5). Without a Fourth Amendment violation, Plaintiff's conspiracy to violate his rights fails as a matter of law.

Even if Plaintiff's allegations could be analyzed under the Fourth Amendment, Plaintiff fails to proffer facts illustrative of Defendant Holt's participation in any such "conspiracy" for Jordan to interrogate Plaintiff under false pretenses, thus depriving Plaintiff of constitutional safeguards. *See Burton, supra.* "To advance past the summary judgment stage, [Plaintiff] must allege with particularity and specifically demonstrate material facts that the defendants reached an agreement." *Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 582 (8th Cir. 2006) (cleaned up) (affirming grant of summary judgment on plaintiff's § 1983 claim where plaintiff presented "no specific material facts, circumstantial or otherwise, that the officers formed an agreement to violate [the plaintiff's] constitutional rights"). There simply is no evidence that Defendant Holt reached any agreement with Separate Defendant Jordan and no reasonable juror could infer the existence of a conspiracy without any evidence. Plaintiff's conclusory allegations "are nothing more than legal conclusions that are not entitled to a presumption of truth." *Scheirbaum v. Canavan,* 2021 WL 4061566, at *4 (E.D. Mo. 2021). The record before the Court neither establishes a violation of the Fourth Amendment by Defendant Holt nor contains evidence of Defendant Holt's participation in a conspiracy to deprive Plaintiff of his rights. Where the "record contains no proof beyond speculation," dismissal of a § 1983 conspiracy claim is warranted. *Askew,* 191 F.3d at 958.

For these reasons, the undersigned finds and recommends that summary judgment be granted in favor the County Defendants (Defendant Holt) with respect to Plaintiff's Fourth Amendment claims.

### B.  Fifth Amendment Claim

Plaintiff's Fifth Amendment is also subject to summary judgment.   In Claim 4 of the Third Amended Complaint, Plaintiff reiterates his theory that Defendant Holt and others "conspired to have Jordan act and impersonate a false representation of a bondsman on Feb. 1, 2018, in a deceitful attempt to withdraw information from myself about the criminal investigation . . . at no point did Jordan notify me he was police officer or notified me of my rights.  . . . Defendants conspired to question me under false pretenses after my arrest and I requested an attorney in an attempt to withdraw inculpatory evidence by personal statement but I refused to cooperate."  (ECF No. 135 at 9).

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibits the admission into evidence of statements given by a suspect during "custodial interrogation." In general, once an individual invokes his right to counsel custodial interrogation must cease. *Moran v. Burbine*, 475 U.S. 412, 433 n.4 (1986).   If, however, statements obtained during custodial interrogation are not used against a party at trial, there is no constitutional violation.  *Davis v. City of Charleston*, 827 F.2d 317, 322 (8th Cir. 1987).   "[A] litigant cannot maintain an action under § 1983 based on a violation of the *Miranda* safeguards.... [Th]e remedy for a *Miranda* violation is the exclusion of evidence of any compelled self-incrimination, not a section 1983 action." *Hannon v. Sanner*, 441 F.3d 635, 636 (8th Cir. 2006) (cleaned up).

The record is undisputed that on August 13, 2018, Plaintiff pled guilty to multiple offenses, including offenses for which he was arrested prior to any custodial interrogation by Separate Defendant Jordan.  Plaintiff pled guilty and thus, there was no trial.  Because no information obtained by Separate Defendant Jordan during the alleged unconstitutional custodial interrogation was used against Plaintiff at trial, no Fifth Amendment claim is stated.  *Davis v. City of Charleston*, 827 F.2d 317, 322 (8th Cir. 1987), citing *Hampton v. Gilmore,* 60 F.R.D. 71 (E.D. Mo. 1973) (remedies for violation of *Miranda* is inadmissibility at trial).  Without a Fifth Amendment violation, Plaintiff's claim that Defendant Holt conspired to deprive Plaintiff of his constitutional rights fails as a matter of law, and it is recommended that summary judgment be granted in favor of the County Defendants with respect to Plaintiff's Fifth Amendment claim.

Although unnecessary for its decision, the Court makes these observations.  Plaintiff has failed to present proof that Defendant Holt participated with Separate Defendant Jordan in a conspiracy to violate Plaintiff's Fifth Amendment rights.  *See Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990).  And Plaintiff's own admissions undermine his § 1983 conspiracy claim – Plaintiff is adamant that despite the alleged conspiratorial subterfuge of Defendant Holt and Separate Defendant Jordan to violate his constitutionally protected rights, Plaintiff "refused" to "answer" Defendant Jordan's questions, and thus, by his own admission, Plaintiff did not fall victim to the conspiratorial scheme he alleges. (ECF No. 135 at 5).  Lack of evidence of the requisite injury arising from the overt act taken in furtherance of the conspiracy involving Defendant Holt would have been fatal to Plaintiff's claim had he leapt the other hurdles.

### C.  Arkansas Freedom of Information Act

In Claim 5 of the Third Amended Complaint, Plaintiff complains of irregularities with respect to the requests he submitted under Arkansas' Freedom of Information Act.  (ECF No.

135 at 9).   Violation of the Arkansas Freedom of Information Act is not cognizable under §

1983.   *See Taylor v. Denniston*, 111 Fed.Appx. 864 (8th Cir. 2004) (unpublished (citing *Walker*

*v. Reed*, 104 F.3d 156, 157 (8th Cir 1997)); *see also, Chesterfield Dev. Corp. v. City of*

*Chesterfield*, 963 F.2d 1102, 1105 (8th Cir. 1992) (Even "[a] bad-faith violation of state law

remains only a violation of state law.").   The County Defendants are entitled to summary

judgment on Plaintiff's FOIA claims.

### D.  Failure to Protect

The Court previously held that Plaintiff's Third Amended Complaint states plausible

claims (Claims 6, 8, 9, 12) for failure to protect against County Defendants Cruz, Guerrero,

Brady, and Allen.  (ECF No. 144 at 10-11).  Plaintiff's failure to protect claims involve two

separate incidents involving altercations with another inmate, Robert Brinegar. The incidents

occurred on February 3, 2018, and April 15, 2018.  (ECF No. 135 at 10, 11, 12).

Prison officials have a duty, under the Eighth Amendment, to protect prisoners from

violence at the hands of other prisoners.  *See Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir.

1998) (citing *Thomas v. Booker*, 784 F.2d 299 (8th Cir. 1986) (analyzing a pretrial detainee's

failure-to-protect claim under the same Eighth Amendment analysis used for similar claims

brought by prisoners)).  However, not "every injury suffered by one prisoner at the hands of

another . . . translates into constitutional liability for prison officials responsible for the victim's

safety." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

To prevail on his failure to protect claim, Plaintiff must satisfy a two prong test: (1) show

he was "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the

prison officials were "deliberately indifferent [to his] health or safety."   *See Holden v. Hirner,*

663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted).  The first prong is an objective

requirement to ensure the deprivation is a violation of a constitutional right. *Id.* The second, however, is subjective requiring that Plaintiff show the official "both knew of and disregarded 'an excessive risk to inmate health or safety.'" *Id. (*quoting *Farmers,* 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007). Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon County,* 607 F.3d 543, 549 (8th Cir. 2010) (cleaned up). Furthermore, "[c]laims under the Eighth Amendment require a compensable injury to be greater than *de minimis*." *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008).

The undisputed facts establish that Plaintiff was first involved in an altercation with Robert Brinegar on February 3, 2018, in a bathroom of E-Pod. (ECF No. 205-1; 201-5). The incident involved verbal threats and some pushing. Although the incident was originally investigated under the PREA because Plaintiff was naked at the time of the altercation, Plaintiff denied any sexual assault or contact between he and Brinegar. Following the investigation of the incident, Defendant Adams placed a "keep separate" between Plaintiff and Brinegar, precluding them from being housed in the same pod. (ECF No. 205-1 at 3; 205-2 at 2).

With respect to the February 3 incident, Plaintiff alleges that County Defendants Brady and Allen violated his constitutional rights by failing to protect him. Although the Court determined Plaintiff's allegations against Defendants Brady and Allen survived dismissal, Plaintiff fatally has failed to provide proof – required at the summary judgment stage – which would support Plaintiff's failure to protect claim against these County Defendants. Notably, Plaintiff only complains of Defendant Brady's actions **following, but not before,** the February 3

incident.  Plaintiff has produced no evidence that Defendant Brady knew or should have known that inmate Brinegar posed an excessive risk to Plaintiff's health or safety as of February 3, 2018.  *See Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998) ("[D]eliberate indifference must be viewed from [defendant's] perspective at the time in question . . . .")  And with respect to Defendant Allen, it is undisputed that he was not at work at BCDC on February 3, 2018.  (ECF No. 201-1 at 201-8).

The second incident with Plaintiff and Brinegar occurred on April 15, 2018.  (ECF No. 205-1 at 4).  While returning from a haircut, Plaintiff asked to take a shower.  (ECF No. 201-5 at 6).  Defendant Cruz instructed Plaintiff to shower in E-103.  On that date, Plaintiff's housing instructions were for him to be "housed and rec alone."  At the time of the incident, inmates in Plaintiff's pod E-102 were out cleaning and the inmates in E-103 were locked down.  According to Defendant Cruz's incident report, these reasons supported his instruction to Plaintiff to use the shower in E-103 following his haircut.  (ECF No. 201-5 at 6).  During Plaintiff's shower, Brinegar was allowed to leave his cell to retrieve medical cream left for him by the nurse.  After Brinegar received his medical cream from Deputy Cruz and was walking back up the stairs, he stopped at the shower and initiated the altercation with Plaintiff.  Defendant Cruz's contemporaneous report states he did not know the two inmates were to be kept separate.  (ECF No. 201-5 at 6).  Defendant Cruz ordered Brinegar back to his cell, but Brinegar defied.  *Id*.  Defendant Cruz called for assistance, ran up the stairs, and took control of Brinegar, restraining him.  *Id*.  Defendant Cruz had radioed for assistance and Defendant Guerrero (along with three other deputies) responded to help Cruz gain control.  (ECF No. 201-5 at 7).  The video supports

that Defendant Cruz was able to gain control of Brinegar within seconds of Brinegar entering the shower. (ECF No. 201-7).[4]

Plaintiff alleges that Defendant Cruz in fact knew Brinegar was to be kept separate from him and that Cruz and Guerrero "orchestrate[d]" this sexual assault by intentionally allowing Brinegar access to Plaintiff while showering.  (ECF No. 135, p. 10). There is no proof – direct or circumstantial – to support Plaintiff's bare assertions of yet another conspiracy to violate his rights.  Rather, the undisputed evidence reflects that Defendant Cruz was unaware that Brinegar and Plaintiff were to be kept separate, and when Defendant Cruz viewed Brinegar entering the shower, Cruz responded immediately and ended the encounter within seconds.  (ECF No. 201-5 at 6; No. 201-7).  To be successful in his failure to protect claim, Plaintiff must show Defendants "both knew of and disregarded 'an excessive risk to inmate health or safety.'" *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) *(quoting Farmers,* 511 U.S. at 837).  "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it."  *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007).   While there is no evidence Defendant Cruz **knew** Brinegar posed a substantial risk to Plaintiff if Brinegar was allowed out of his cell to retrieve a medication, the undisputed evidence is that Defendant Cruz responded immediately, reasonably, and successfully, expediently ending the encounter by removing Brinegar.  To satisfy the second prong of his claim, Plaintiff must establish Defendant Cruz

---

[4] Plaintiff alleges he was sexually assaulted on April 15, 2018, and this sexual assault resulted in swelling, bruising, numbness, trouble getting erect, nerve damage, hemorrhoids, ulcers, prostate infection, and emotional distress, to include PTSD for which he received no medical treatment until he arrived at the Arkansas Department of Corrections.  (ECF No. 135, pp. 10-12).  The Court notes that the video viewed by the Court reflects that during the few seconds of the April 15 encounter between Plaintiff and Brinegar, Plaintiff was naked, but Brinegar was fully clothed. As Plaintiff has failed to meet his burden with respect to the deliberate indifference component of his Eighth Amendment claim, it is unnecessary for the Court to evaluate Plaintiff's injuries or determine whether they were more than *de minimis* under *Irving, supra.*

"recklessly disregard[ed] a known, excessive risk of serious harm to the inmate." *Davis v. Oregon County,* 607 F.3d 543, 549 (8th Cir. 2010) (cleaned up). Plaintiff simply has not met his required burden; Plaintiff cannot illustrate ". . . sufficient evidence to support a jury verdict in [his] favor." *Nat'l Bank,* 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). The undisputed evidence does not support disregard – reckless or otherwise – by Defendant Cruz. To the contrary, the evidence reflects that when Brinegar approached Plaintiff, Defendant Cruz acted without haste to protect the safety of Plaintiff. Neither Defendant Cruz (nor Defendant Guerrero who has been included) violated Plaintiff's Eighth Amendment rights.

Based on the undisputed facts, the County Defendants are entitled to summary judgment with respect to Plaintiff's failure to protect claims.

### E. First Amendment Retaliation

The Court liberally has construed certain statements in Claims 10 and 11 of Plaintiff's Third Amended Complaint as First Amendment retaliation claims. (ECF No. 144 at 10-11). Plaintiff argues the County Defendants retaliated against him by keeping him in Administrative Segregation ("Lockdown") for filing grievances and for refusing to cooperate in the investigation against him. (ECF No. 228 at 10). Plaintiff additionally argues he was retaliated against by being denied a notary public, law library access, legal mail, and FOIA materials. (ECF No. 228 at 10).

Generally, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber,* 256 F.3d 764, 771 (8th Cir. 2001) (citing *Madewell v. Roberts,* 909 F.2d 1203, 1206 (8th Cir. 1990)). "Indeed, the retaliatory conduct does not itself need to be a constitutional violation in order to be actionable." *Id.; see also Dixon v. Brown,* 38 F.3d 379,

380 (8th Cir. 1994) ("[W]hen retaliatory conduct is involved, there is no independent injury requirement.").

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary firmness' from continuing in the activity;" and (3) the adverse action was motivated at least in part by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.,* 673 F.3d 799, 807-8 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

Retaliation claims fail "if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008). Therefore, "a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Id.* "[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." *Id.* at 831. "In a retaliatory transfer case, the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred." *Sisneros v. Nix*, 95 F.3d 749, 752 (8th Cir. 1996) (internal quotation omitted). "Even if retaliation was one factor in the decision to transfer [an inmate]," the inmate must show that his transfer would not have occurred "but for" the retaliation. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1026 (8th Cir. 2012); *Webb v. Hedrick*, 409 F. App'x 33, 35 (8th Cir. 2010) (unpublished).

It is undisputed that Plaintiff was on disciplinary lockdown from March 29, 2018, until June 1, 2018, with some of his five (5) lockdown periods running concurrently. There is ample evidence before the Court that Plaintiff's complained of housing segregation resulted, at least in

part, due to rule violations by Plaintiff and on occasion for Plaintiff's protection, and Plaintiff, on the other hand, presents no evidence that his lockdowns "would not have occurred 'but for' the retaliation." *See Beaulieu*, 690 F.3d at 1026. And while the denial of privileges can constitute an adverse action when making a case for retaliation, it appears that Plaintiff's requests (for a notary, for law library access, for FOIA requests) were handled via BCDC's policies. Even if Plaintiff's denial of privileges was violative of BCDC's policies, Plaintiff supplies only broad speculation and conjecture – there is no proof that Plaintiff's grievances or other protected activities were motivating factors for BCDC's "adverse action" of denial of privileges. Plaintiff failed to comply with F.R.Civ.P. 56 and meet "proof with proof" as required to proceed beyond summary judgment. The undersigned recommends that County Defendants be granted summary judgment with respect to Plaintiff's claims of retaliation.

### F. Qualified Immunity

Finally, the County Defendants alternatively argue they are entitled to qualified immunity with respect to Plaintiff's claims against them. The Court, having found the evidence does not support that a constitutional violation was committed by the County Defendants, finds they are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### VI. CONCLUSION

For the reasons and upon the authorities discussed above, it is recommended that the Motion for Summary Judgment (ECF No. 199) filed by Deputy Adrian Cruz, Robin Holt, Deputy Joseph Allen, Megan Rutledge, Nicholas Guerrero, Lieutenant Randall McElroy, Sgt. Joe Adams, Deputy A. Cobb, Sgt. Trey Bandy, Sgt. Kenneth Cogdill, and W. Guenther be

GRANTED, and these Benton County Defendants DISMISSED WITH PREJUDICE.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 31st day of January 2022.

*Christy Comstock*
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE